759 So.2d 851 (2000)
Glenn SMITH, et al.
v.
Jimmie CUTTS, et al.
No. 99-253.
Court of Appeal of Louisiana, Third Circuit.
March 15, 2000.
Writ Denied June 2, 2000.
A. Bruce Perkins, II, Alexandria, LA, Counsel for Glenn Smith, et al., Plaintiffs/Appellees.
Howard B. Gist, III, Gist, Methvin & Hughes, Alexandria, LA, J. Phillip Terrell, *852 Alexandria, LA, Counsel for Jimmie Cutts, et ux. and New Hampshire Insurance Company, Defendants/Appellants.
Thomas Wells, Assistant District Attorney, Alexandria, LA, Counsel for Rapides Parish Police Jury, Defendant/Appellee.
Victoria Murry, Assistant Attorney General, Alexandria, LA, Counsel for State of Louisiana, Department of Health & Hospitals.
Richard Young, (in proper person) Boyce, LA, Defendant/Appellee.
Court composed of Judge ULYSSES GENE THIBODEAUX, Judge SYLVIA R. COOKS and Judge ELIZABETH A. PICKETT.
THIBODEAUX, Judge.
Defendants, Jimmie and Brenda Cutts, appeal the trial court's judgment awarding plaintiffs, Glenn and Cynthia Smith, damages resulting from the back-up of sewage on the Smiths' property. The trial court also enjoined Mr. and Mrs. Cutts from using and operating the toilets and plumbing on their property until the sewage from their sewer treatment plant does not affect the Smiths' property. We affirm that portion of the judgment which granted the injunction and assessed damages and reverse the assessment of fault to apportion the fault equally to Jimmie and Brenda Cutts, the Louisiana State Department of Health and Hospitals, Office of Public Health, and Richard Young, the installer of the sewer treatment plant.

I.

ISSUES
We shall consider whether:
1. the trial court erred in finding that Jimmie and Brenda Cutts were at fault for complying with the State Health Department's requirement to install a sanitary treatment plant on their property;
2. the trial court erred in failing to consider the Rapides Parish Police Jury's obligation to receive "treated" effluent in the parish ditches by keeping open the natural drain and to prohibit Glenn Smith from blocking the parish ditch with dirt;
3. the trial court erred in failing to consider the negligence and/or fault of Glenn Smith, the plaintiff, who caused his own damages by placing dirt in the parish ditch which caused the sanitary treatment plant to malfunction and thereby caused raw sewage to rest on the Smiths' property;
4. the trial court erred in granting the injunction against Jimmie and Brenda Cutts when the actual cause of the sewage problem was the negligence and/or fault of Glenn Smith in placing the dirt in the parish ditch which thereby caused the sanitary treatment plant to malfunction; and,
5. the trial court abused its discretion in awarding $50,000.00 in general damages for mental pain and suffering, $15,000.00 for loss of use of the Smiths' property, and $26,990.00 for the repairs of the Smiths' driveway.

II.

BACKGROUND FACTS AND PROCEDURAL HISTORY
The Smiths own property in the Sibinia Heights Subdivision in rural Rapides Parish. Their property is adjacent to and below the Cutts' estate. The subdivision was plated in 1958 and development of individual lots began shortly thereafter. Today, the subdivision is an established neighborhood where the sizes and conditions of the homes vary. It is the residents' responsibility to provide for the removal of household sewage as there is no public sewer system.[1]
*853 Prior to 1994, the Cutts used a septic tank for disposal of their waste. The septic tank flowed by field lines from their house to a vacant wooden area located behind the subdivision. In 1994, the Cutts' field lines began malfunctioning by discharging sewage to the surface of the ground. The exposed sewage followed the natural course of travel for surface waters and eventually came to rest on the Smiths' property.
In March 1994, Glenn Smith filed a complaint with the Louisiana State Department of Health and Hospitals, Office of Public Health (State) regarding the accretion of sewage on his property. Thereafter, prompted by Smith's complaint, Brenda Cutts contacted the State seeking a solution to the sewage discharge problem. After examining the Cutts' property, the State recommended the installation of an individual sewage treatment plant.[2] On November 9, 1994, the State issued a temporary permit officially authorizing installation of the sewage treatment plant according to the strictures of the State Sanitary Code. Two days later, Richard Young, a state-certified installer of individual sewerage systems, installed the Cutts' sewage treatment plant in their backyard. The plant's discharge pipe was positioned to carry the treated effluent to the front of the Cutts' home for ejection into a parish roadside ditch.[3] Once discharged the treated effluent follows the natural course of travel and proceeds downhill, emigrating to the parish roadside ditch fronting the Smiths' property. This installation was approved by the State.
In January 1995, Glenn Smith complained to the State and the Rapides Parish Police Jury (Police Jury) that the effluent discharge from the Cutts' sewer treatment plant was stagnating on his property. Human waste and other excrements accreted on the Smiths' driveway, front lawn and side of their home. The sewage was noxious and hazardous and eroded the Smiths' driveway, according to the Smiths. On January 9, 1995, Melissa Ray Bordelon, a Department of Health and Human Services, Office of Public Health sanitarian who recommended the Cutts' install a sewer treatment plant, inspected the plant. Bordelon concluded the Smiths' problem was not inadequate drainage, but discharge which was not properly treated because paint and its waste water had been dumped into the sewer treatment plant. The Cutts were advised this was abusive to the waste treatment system and were directed to refrain from putting such harsh chemicals into the plant. Bordelon believed this would alleviate the Smiths' problem. It did not. Consequently, the Smiths' decided to resolve the problem themselves.
The Smiths attempted to impede the natural flow of drainage by filling in the drainage ditch in front of their house with *854 dirt. They also erected a dirt barrier between their and the Cutts' estate. Nevertheless, sewage continued to accumulate on the Smiths' property. Shortly thereafter, at the insistence of the Police Jury, Cecil Raggio (Public Works Director and Parish Engineer) and T.J. Speir (manager of the Rapides Parish Health Unit) inspected the Smiths' estate. They concluded poor drainage was the cause of the flooding. To combat the constant accretion of sewage, Raggio proposed "running an outfall ditch" on the Smiths' property and between the Smiths' property and their neighbor to the south. This required the Parish to obtain a drainage servitude from the Smiths' southern neighbor. The neighbor was willing to give the Parish the servitude, provided they "piped" the ditch. The Parish, however, believing it was not responsible for this added expense, refused to pay to have the ditch piped. Consequently, the Parish failed to obtain the servitude; and, thus, the plan was never effectuated. Raggio and Speirs also discussed the possibility of piping the drainage across Gilly Williams Road (the road fronting the Sibinia Heights Subdivision) to a ditch which runs parallel to a railroad track. This plan was never implemented as the railroad refused to grant the Parish a drainage servitude.
In August 1995, the State informed the Cutts they were violating the State Sanitary Code by creating a public nuisance. The State alleged that the sewer treatment plant's discharge pipe was too close to the Smiths' property line and the quality of the discharge was substandard. The only attempt by the Cutts to correct these violations was to attach a "lift station" to their sewer treatment system. Prior to installation of the lift station, the mouth of the sewer treatment plant's discharge pipe rested in the roadside ditch fronting the Cutts' home. Again, according to the State Sanitary Code, this was too close to the Smiths' property.[4] The lift station relocated the discharge pipe to the uphill side of the Cutts' property, away from the Smiths' estate. Nevertheless, despite the rerouting of the discharge pipe, the nuisance remained as the effluent continued to flow downhill in the direction of and onto the Smiths' property.
On October 13, 1995, due to the continued sewage build-up, the Smiths filed a Petition for Preliminary Injunction and Damages against the Cutts, the State, and the Police Jury. The Smiths, subsequently, by supplemental and amending petition, added Young as a defendant.[5] The Smiths also filed a Petition for Writ of Mandamus seeking to have the State enforce the guidelines of the State Sanitary Code by ordering the Cutts to discontinue operating their sewage treatment plant. The trial court deferred this writ to the trial on the merits.
The Smiths alleged the Cutts were at fault for owning a defective sewer treatment system, in failing to correct the defective condition, in failing to properly provide bedding for effluent discharge, and in failing to adequately provide a safe discharge area. The Smiths allege the State was negligent in its issuance of a permit for the defective sewer treatment system, in failing to inspect the defective sewer treatment system, in allowing the effluent to stagnate, and in failing to revoke the *855 issued permit. The Police Jury, according to the Smiths, was negligent in failing to maintain proper elevation of land and ditches for drainage, in failing to work with the State to remedy the problem, and in allowing raw effluent to "stand in a cesspool and cause a nuisance." Finally, the Smiths claimed Young was negligent in failing to adequately install and maintain the sewer treatment plant, and in failing to provide a proper bedding for the effluent discharge.
In response to the suit, the State cross-claimed the Cutts alleging their continued operation of the sewage treatment plant, despite being served with a notice of violations, was the proximate cause of the Smiths' damages. The State also cross-claimed the Police Jury alleging it failed to provide adequate drainage for the effluent and failed to work with the State to remedy the condition, thereby causing the Smiths to suffer damages. Additionally, the State alleged contributory negligence on the part of the Smiths for blocking the drainage by filling in the ditch fronting their home and building an earthen barrier along the boundary line between their and the Cutts' estates.
The Cutts responded by filing a reconventional demand contending the Smiths' interference with the natural drainage caused the sewage treatment plant to malfunction, thus resulting in damages to the Cutts. The Cutts also cross-claimed the Police Jury alleging its failure to prove adequate drainage contributed to the damages suffered by all parties.
After trial, the court below found no liability on the part of the State, the Police Jury, or Young and dismissed them from the suit. The trial court, however, concluded the Cutts improperly permitted sewage to drain and pool on the Smiths' property. The Smiths were awarded $50,000.00 in general damages "for mental pain and suffering," $15,000.00 in loss of use,[6] and $ 26,990.00 for repair of their driveway. Additionally, the Court enjoined the Cutts and their lessees from "use and operation of toilets and plumbing" until the sewage is disposed of "in a manner that doesn't affect the Smith's [sic] property." This appeal now follows.

III.

LAW AND ANALYSIS

Liability for the Smith's Damages
There is no dispute the Smiths have suffered both personal and property damage as a result of the accretion of sewage on their property. The decisive issue is who, among the named defendants, is liable for the damage caused.
The trial court based its finding of liability on La.Civ.Code art. 667 which, in pertinent part, provides:
Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it which may deprive his neighbors of the liberty of enjoying his own, or which may be the cause of the damage to him.
This article imposes civil responsibility for acts, constructions, and activities that may be "the cause of damage" (structural damages to immovable property, for depreciation of land values, and all personal injuries) to neighboring landowners. Yiannopoulos, 4 Civil Law Treatise Predial Servitudes § 51. The trial court held the inundation of sewage on the Smiths' property is violative of this codal provision. The court then concluded the onslaught resulted solely from the Cutts' negligent operation of the sewer treatment plant and imposed liability on them recognizing that, "[e]very act whatever of man that causes damages to another obliges him by whose fault it happened to repair it." La.Civ.Code art. 2315. We agree the Smiths are entitled to relief under this *856 codal provision. However, we do not agree the Cutts are solely liable for those damages caused by the sewage invasion. Rather, we conclude the State and Young are equally responsible with Mr. and Mrs. Cutts for the Smiths' damages.
The Cutts operated the sewer treatment plant in accordance with those standards set forth by the State and Young. Jimmie Cutts testified:
Q: Do you think that a landowner, just in your mind, a landowner can put effluent or treated sewage on another person's property without asking their permission?
A: Yes, sir.
Q: You think you can do that?
A: In this particular case, yes.
Q: And why is that?
A: Because there'stheyeverybody does it. All the pipes are in the ditches everywhere else.
Q: Uh-huh (yes). So you just think because everybody else did it you didn't have to ask permission from the Police Jury to dump effluent in their ditch?
A: I didn't think I had to ask permission because as I understood it you had to get a permit from the Health Department, and they're the ones that regulated where it went or what they done with it. I(interrupted)
Q: So you felt that if you got permission from the State of Louisiana and they said it was okay to dump on somebody else's property that it was okay with you?
A: Yes, sir.
Q: That you complied with everything, is that correct?
A: Yes, sir, to my understanding.
The Cutts were complying with a directive of the State. The State determined the roadside ditch was adequate drainage for the sewer treatment plant's discharge; and, thereafter directed the Cutts to pipe the effluent into the culvert. Young placed the discharge pipe in the roadside ditch, declaring the "discharge location and elevation" acceptable. Jimmie Cutts confirmed:
Q: And that you did this without any permission, written or verbal, from the Rapides Parish Police Jury, isn't that correct?
A: That's correct.
Q: That the sole authority that you got to do this is from the State of Louisiana?
A: That's right.
Q: Okay, and the State of Louisiana is the one that told you howwhat kind of system to put in and where to put it and where to put the discharge pipe, is that correct?
A: That's correct.
Q: Okay. Now, you haveMr. Young, the plumber, installed it for you, right?
A: Yes, sir.
Q: And heit's your understanding he was following the direction of therules and regulations of the State of Louisiana?
A: Yes.
Louisiana State Sanitary Code 13-012-1 provides:
No person shall install, cause to be installed, materially alter subsequent to installation, or operate an individual sewage system of any kind without first having obtained a permit from the State Health Officer. No person shall install, cause to be installed, or materially alter subsequent to installation an individual sewage system of any kind except in accordance with the plans and specifications for the installation which have been approved as a part of a permit issued by the State Health Officer. Such permits shall be issued in a two-stage process in accordance with Sections 13:012-2 and 13:012-3.
Further, Louisiana State Sanitary Code 13:012-2 provides:
Upon receipt of a request for such permit, and approval of plans and specifications for the proposed individual sewage *857 system (which shall accompany any such request for permit), a "temporary" permit authorizing the installation of said system may be issued. Any such "temporary" permit shall be in writing and shall not be issued until, with respect to the property and its surroundings, the State Health Officer has determined that connection to a community-typed sewage system is not feasible, and that the condition of the soil, the natural drainage, the lot size/dimensions, and other related factors are such that the construction and use of properly designed individual facilities are not likely to create a nuisance or public health hazard.

(Emphasis ours.)
Gary Linscum of the Department of Health and Hospitals, Office of Public Health, Rapides Health Unit, testified the fluid discharge site is a "very critical factor" in determining whether an individual sewage facility is "not likely to create a nuisance or a public health hazard." Linscum explained: "[b]ecause the treatment fluid, although is clear and odorless water, can't just be drained onto adjoining property, or onto property they do not own...."[7] Larry Amberg, Sanitary and Regional Director, Department of Health and Hospitals, Office of Public Health, affirmed this admission when he testified the State's intention is "to prohibit discharge of treated effluent on private property unless the private owner is granted permission for that discharge." When questioned about the process of determining whether the discharge site is proper, Amberg testified:
Q: Okay, and when you look at drainage do you look at the natural servitude or, should I say, which way it's going to flow, or what do you do? Do you, I mean, y'all just eyeball it or what?
A: Well, you use your experience of the topography of the area, but you're going to address the drainage. You're going to make sure it does not create a nuisance for the neighbors or for anyone else. So basically you justyou do a survey.
The "surveys" taken, are not in-depth appraisals of the land. According to Speirs, sanitarians simply "look at the discharge point to see whether or not we think it will drain."
Bordelon's "survey" of the Cutts' property lasted "fifteen (15) minutes" during which time she inspected, "the lay of the land, type soil, and the discharge sites." With respect to examination of the discharge site Bordelon acknowledged: "[w]e look to see if there is a ditch, if it drains." She determined, "[t]here was a ditch" and "it drains." Based on this finding, Bordelon concluded "it was appropriate to put sewer treatment plant discharge in it." We do not believe this observation alone justifies the decision permitting the Cutts to discharge effluent into the roadside ditch fronting their estate. We interpret State Sanitary Code 13:012-2 as requiring the State to have a firm appreciation and understanding of the area's topography before authorizing the installation of an individual sewage system. Particularly, the State should be cognizant of exactly where the discharged effluent flows. Without such understanding, a competent determination as to whether the individual facilities are likely to create a nuisance or public health hazard cannot be made. This case substantiates our position. Bordelon admits she was not completely familiar with Sibinia Height's terrain. When questioned about the drainage Bordelon testified:
Q: Where would it have been discharging?
A: Into the front road ditch.
Q: Anyone from up there where it does the same thing?
A: Underneath a concrete driveway, into another front road ditch.

*858 Q: And then what?
A: Down.
Q: Do you know if the topography of the land on the other side of Mr. Smith's property is down hill?
A: In from Mrs. Cuttss [sic] property to Mr. Smiths' property is down hill. After that there is a vacant lot and shortly after that it does sort of go back up hill. There is a cross culvert.
Q: But you don't know exactly the exact natural servitude of the watershed across Mr. Smith's front yard?
A: No, sir.
Q: So you are speculating?
A: Yes, sir.
It was improper for Bordelon to recommend the installation of a sewage treatment plant and order the effluent discharged into the roadside ditch without ascertaining the excretion's path and where it would come to rest. This decision, because of its potential widespread cataclysmic consequences, should not have been based on mere conjecture. Had Bordelon done more than just "speculate," as to the drainage, she would have concluded the discharge area was inappropriate. Simply inquiring as to where surface waters flow could have prevented this crisis.
The Cutts admit they knew, before discharge was piped into the roadside ditch, that surface waters flow from their property into the roadside ditch, onto and across the Smiths' property. Jimmie Cutts succinctly acknowledged, "[i]t's got to flow to his property. It's downhill." Mr. and Mrs. Smith cannot be required to accept effluent from the dominant estate of Mr. and Mrs. Cutts. Even chlorinated effluent is an unacceptable discharge. Thigpen v. Moss, 504 So.2d 664 (La.App. 3 Cir.1987).
Following installation, the State Sanitary Code requires the individual sewage system's installer to submit to the State a "Survey Checklist and Certificate." Since the State does not directly supervise the installation of individual sewage systems, the checklist is the method by which installer compliance with the minimal installation requirements set forth by the State Sanitary Code is verified. Amberg testified the checklist, "is an affidavit as to how it (the sewage system) was actually installed." To complete the checklist the installer must inspect the premises and determine whether the location can support the proposed sewage system. Again, the primary consideration is the drainage. After inspecting the premises, Young ratified the State's decision to pipe the discharge in the roadside parish ditch pronouncing: discharge location and elevation acceptable (i.e. to surface drainage, backflow prevented, etc.). It is evident this conclusion was erroneous. At the time of installation, the roadside ditch in front of the Smiths' estate was not completely dug out. Brenda Cutts observed:
they weren't dug ditches. They were like, you know, where the water always flowed. They weren't dug out deep, you know. You can just see the grass and the slope.
Raggio testified the parish did not dig its ditches in anticipation of accepting treated effluent. Consequently, when asked whether the discharge pipe should have been placed in the parish roadside ditch, Raggio testified:
Q: Okay. And would you have given your permission if asked to allow treated effluent to get in the parish ditch?
A: If I'd have gone out and looked at, I would not have given permissionI would have recommended no approval.
Further, Speir testified under the particular circumstances he would not have recommended discharging the treated effluent into parish roadside ditch. Accordingly, despite his avowal, we conclude Young was remiss in ratifying the State's decision to place the discharge pipe into the parish roadside ditch.
The State contends the roadside ditch, at the time it ordered the effluent piped into the trench, was a suitable discharge *859 area. Thus, the command was proper. According to the State, the Smiths are inundated with sewage because they filled in the ditch fronting their home. Testimony belies the State's contention and establishes that the natural drainage (unobstructed ditch) cannot, without modifications, properly accommodate the discharged effluent. An open ditch will not prevent the Cutts' sewage from stagnating on the Smiths' property. Raggio testified that if the ditch was open, the discharged effluent would sheet flow across the Smiths' property because of the natural flow of drainage. Raggio's position was confirmed by former Parish Police juror Opal Hudson who testified she observed sewage seeping onto the Smiths' property days after installation of the sewage treatment plant; months before the ditch was plugged.

Damages
Having concluded the court below erred in its assignment of liability, we must now render judgment in a manner which is just, legal, and proper on the record presented. La.Code Civ.P. art. 2164.
To conform to the assignment of fault, we reallocate those damages assessed solely against the Cutts and their insurer, New Hampshire Insurance Company, to the State, Young, and Mr. and Mrs. Cutts in proportion of one-third each. Each party is solidarily liable as this claim arose prior to the pre-amendment version of La. Civ.Code art. 2324. See Aucoin v. Dep't of Transportation & Dev., 97-1938, 97-1967 (La.4/24/98); 712 So.2d 62.
The trial court fashioned an award which indemnified the Smiths for damage to and loss of use of their property and mental anguish suffered by the discharge of effluent onto their estate. The amount awarded for property damage is consistent with Henry Longino's (an expert in field construction with specialization in concrete finishing) testimony estimating the cost of repairing and fixing the damaged soil and concrete around the Smiths' house to be $26,990.00. Longino's estimate was corroborated by the summary report of Earl Waltman (an expert appraiser) which, in pertinent part, stated:
The estimated cost to repair or remove the contaminated soil and substances (IE: soil, walk ways & driveway) is $26,000.00 to $28,000.00 and does not include possible damages that could occur with disclosure to potential buyer. It is my understanding none of the effluent has drained into the home, henceforth my final estimate of value is based upon this fact.
Neither the Cutts nor the State presented evidence rebutting these estimates. We, thus, defer to the trial court's damage assessment.
With respect to damages for mental anguish and loss property use, calculating an award which would fully compensate the Smiths is an arduous task. In his written reasons for judgment the trial judge poignantly recited:
Damages are difficult to assess in a case like this. What is it worth to be driven from your home? What mental anguish is occasioned by observing your home overrun by sewage? What disruption of your life would be caused by the odor of raw or partially raw sewage at your door? You cannot invite people to your home. Your children cannot invite friends to the home. What emotional toll would it take for you to clean and reclean your driveway and patio, knowing the future would bring more of the same.
The trial judge faced a situation where damages are insusceptible of precise measurement. Lacking an exact estimate of damages, he was free to base his conclusions on the facts and circumstances particular to the case. La.Civ.Code art.1999; Eubanks v. State, Dept. of Transp. and Development, 620 So.2d 954 (La.App. 3 Cir.1993); Moore v. Thornwell Warehouse Association, 524 So.2d 828 (La.App. 3 Cir. 1988); Tide Craft, Inc., v. Red Ball Oxygen Co., Inc., 514 So.2d 664 (La.App. 2 *860 Cir.), writs denied, 516 So.2d 135, 136 (La.1987). Until they decided to relocate, the Smiths lived under "intolerable conditions." The fetid sewage was traumatizing and a source of shame. At trial, Cynthia Smith vividly summarized her family's plight. When questioned about their living conditions, she testified:
A: We have no social activity at home. We have no one over to spend the night with my child because of the problem. I cannot work in my yard in my front lawn because there is water there constantly. And there's always problems there. It's just a lot of grief. It's unbearable, it's embarrassing, it's humiliating. It's just a problem that needs to be corrected.
Q: Have you had to move out of this residence during this period?
A: Yes, sir in May of 1997 I just felt like that it justthat I needed to be away from there.
Q: Why May of 1997?
A: My child was in school and the day she was out of school I just told my husband to pick her up early that we would just move to the camp. You get up in the morning and the first thing you see when you go to the front door is their discharge. I felt like when they use the commode it flushed at my front door. That's as simple as it got. The mosquitos were terrible, the fleas, the odor. I have to burn candles in my house because there's [sic] an odor in the house when I lived there. I stayed gone for two months and my child cried to go home because that is her house. This is our home.
* * * * * *
Q: Has anyone in a social setting ever approached you and asked you anything?
A: Yes, sir. I'm asked about it. I cannot go to the grocery store without someone confronting me. Strangers have even came and asked me questions about it that I didn't even know who they were but they knew who I was. And they said, well, when are you going to fix the problem and I said, I don't know.
The Smiths also testified the discharge of sewage onto their property has caused marital strife, which they are in process of "working out." In light of the evidence, the awards of $15,000.00 for loss of use of property and $50,000.00 for mental anguish are appropriate.

Injunction
An injunction is proper to prevent likely future harm. It should be granted upon a demonstration of clear need and where there is no adequate remedy at law. Simon v. Southwest Louisiana Elec. Mem. Corp., 267 So.2d 757 (La. App. 3 Cir.1972). This case is an example of the need of an injunction. We, therefore, affirm the judgment of the trial court which enjoined "the use and operation of the toilets and plumbing at the Cutts' rent house at 5704 Gilly Williams Road by the defendant Cutts, their renters, agents and employees ... until the defendant Cutts properly disposes of his sewage in a manner that doesn't affect the Smiths' property."

IV.

CONCLUSION
For the foregoing reasons, we conclude that the injunction granted by the trial court enjoining the use of the toilets and plumbing at 5704 Gilly Williams Road until Mr. and Mrs. Cutts properly disposes of the sewage is a manner that does not negatively affect the Smiths' property was not error, and we affirm that portion of the judgment.
We further conclude that the award of $50,000.00 in general damages, $15,000.00 for loss of use, and $26,990.00 for repair to the driveway were not abuses of discretion. We, therefore, affirm these awards.
The apportionment of fault solely to Jimmie and Brenda Cutts is reversed as *861 manifestly erroneous. We conclude that Jimmie and Brenda Cutts, Richard Young, and the State of Louisiana, through the Department of Health and Hospitals, Office of Public Health are solidarily liable. Each is assessed with 33 1/3 percent of the fault.
The at fault defendants are cast for court costs in the amount of $6,417.56, to be paid in the proportion of one-third each.
AFFIRMED IN PART, REVERED IN PART AND RENDERED.
NOTES
[1] In the absence of a "community-type sewage system" (defined in the Louisiana State Sanitary Code as "any system publicly or privately owned, usually consisting of collection system, pumping facility and a means of final treatment and disposal ...") homeowners are required to utilize "individual sewage systems" (... any system of piping... that conveys, stores, treats, or disposes of sewage on the property where it originates,...). The three individual sewage treatment systems permitted by the State Sanitary Code are: septic tank with field lines, septic tanks with a oxidation pond, and individual sewer treatment plants. Homeowners are permitted to install an individual sewage system only after obtaining State authorization. State Sanitary Code 13:012-1.
[2] Installation of an individual sewer treatment plant was the only alternative. In 1987, three years after the Cutts installed their septic tank with field line, the State Sanitary Code outlawed use of these systems on properties, like those in the Sibinia Heights Subdivision, where field lines tend to surface because of the soil texture. The State would not approve the installation of a septic tank with oxidation pond because there was insufficient acreage to support the system.
[3] The roadside ditches fronting the lots in the Sibinia Heights Subdivision are maintained by the Parish. Prior to installation of the sewer treatment plant, the Parish, at the Cutts' request, cleaned out the ditch in front of their estate to facilitate drainage.
[4] Appendix A:6.8 of Chapter 13 of the Louisiana State Sanitary Code requires:

Individual mechanical plants must be located at least ten feet from the property line.
In this case the discharge pipe, which is considered in measuring an individual sewer treatment plant's distance from the property line, was seven feet from the property line.
[5] Louisiana State Sanitary Code 13:014-2 provides:

A person installing or providing maintenance for an individual sewage system and the person who is the owner of the premises shall both be responsible for violations [of the State Sanitary Code].
At the time suit was filed, the State had initiated administrative procedures against the Cutts and Young to force compliance with the State Sanitary Code. The State, however, on the advice of counsel, stopped the proceedings after the Smiths filed suit.
[6] In May 1997, due to the continued sewage build-up, the Smiths moved out of their home and relocated to a camp.
[7] Initially the discharge is a "clear and odorless" fluid. The effluent, however, once it begins to stagnate becomes septic and, thus, a health hazard.