STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

05-38


RANDY STANFORD, ET AL.

VERSUS

TOWN OF BALL


**********
APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 178,690
HONORABLE GEORGE C. METOYER, JR., DISTRICT JUDGE
**********

**GLENN B. GREMILLION**
**JUDGE**

**********

Court composed of Glenn B. Gremillion, Billy Howard Ezell, and James T. Genovese, Judges.

**AFFIRMED AS AMENDED.**


**Larry B. Minton**
**P. O. Drawer 13320**
**Alexandria, LA 71315-3320**
**(318) 487-0115**
**Counsel for Plaintiffs/Appellees**
    **Randy Stanford**
    **Sunny Stanford**
    **Randy Stanford, II**
    **Patience Stanford**
    **Laetitia Callahan**
    **Candy Stanford**

**Bradley C. Myers**
**Lana D. Crump**
**Laura L. Hart**
**Kean, Miller, Hawthorne, D'Armond, McCowan, & Jarman, L.L.P.**
**P. O. Box 3513**
**Baton Rouge, LA 70821-3513**
**(225) 387-0999**
**Counsel for Other Appellee**
  **Louisiana Municipal Association**

**Jeffrey Howerton Thomas**
**P. O. Box 756**
**Natchitoches, LA 71458-0756**
**(318) 352-2353**
**Counsel for Intervenor/Appellee**
  **Law Office of Kelly, Townsend &Thomas**

**Stacy Christopher Auzenne**
**Auzenne Law Firm**
**P. O. Box 11817**
**Alexandria, LA 71315-1817**
**(318) 880-0087**
**Counsel for Defendant/Appellant**
  **Town of Ball**

GREMILLION, Judge.

In this case, the defendant, the Town of Ball, appeals the judgment of the trial court awarding $175,000 in general damages to the plaintiffs, Randy Stanford and members of his household for sewer backups at his house.[1] For the following reasons, we affirm the trial court's finding that the Town of Ball is strictly liable for the damage to plaintiff's property but reduce the damage award to $50,500.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 1994, Stanford filed suit against the Town of Ball for damages sustained as a result of the backup of raw sewage into his home. Stanford urged that Ball was strictly liable to him as the exclusive owner and custodian of the sewer system.

Following a trial, written reasons for judgment were issued in October 2003, and a final judgment was rendered in December 2003, awarding the plaintiffs $100,000 in general damages to be divided in virile shares and $50,000 representing attorney fees. Stanford thereafter filed a motion for new trial on the issue of damages. Stanford urged that he did not request attorney fees and that a separate award for attorney fees was erroneous. He further requested an increase in the general damages award. Following a hearing in January 2004, the trial court granted the motion for new trial in March 2004.

Ball thereafter filed a motion to compel an independent medical examination of the plaintiffs. Following a hearing on the motion in June 2004, the

---

[1] Stanford filed suit on behalf of himself and his children: Sunny Stanford, Randy Stanford, II, and Patience Stanford. Laetitia Callahan, Randy's fiancé, and Candy Stanford were also named as plaintiffs.

1

trial court denied Ball's motion. In July 2004, Ball applied for supervisory writs to this court regarding the denial of the motion to compel an IME and a stay of the proceedings in the trial court until this court made a decision on the writ. Both the stay and writ were denied by this court, finding no abuse of discretion in the trial court's ruling. Additionally, both the stay and writ were denied by the Louisiana Supreme Court.

Following a trial in October 2004, on the issue of damages, the trial court rendered a judgment in November 2004, awarding Stanford $150,000, and the remaining plaintiffs $5,000 each. Ball now appeals and assigns as error:

1. The trial court's finding that since Stanford's home was built before Ball's sewerage system was built, Stanford was absolved of any fault.

2. The trial court's finding that Ball is strictly liable to Stanford.

3. The trial court's failure to recognize that an Act of God caused the power failure that led to the sewerage backup into Ball's right-of-way ditch.

4. The trial court's failure to consider that Stanford's trailer is four feet higher than the manhole cover and thus, it would be physically impossible for raw sewerage to backup into the trailer.

5. The trial court's failure to force the plaintiffs to undergo an IME.

6. The trial court's award of excessive punitive damages to the plaintiffs.

The Louisiana Municipal Association (LMA) filed an amicus curiae brief pursuant to the Uniform Rules—Courts of Appeal, Rule 2-12.11, urging that the trial court's ruling is of interest to the approximately three hundred other municipalities

2

in the state of Louisiana. The LMA strongly argues that general damages cannot be awarded when property damage is unproven.

## LAW

We will not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

> The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*Id.* at 844.

Though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Id.* "Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart v. State Through DOTD*, 617 So.2d 880, 883 (La.1993). "[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id.* at 882.

Louisiana Civil Code Article 667 provides the basis for Ball's liability to Stanford:

> Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.

3

It has been repeatedly held that a municipality is strictly liable to a plaintiff property owner under Article 667 when damages are suffered due to sewage overflows into a home from a municipally owned and operated sewer system. *See Smith v. Cutts,* 99-253 (La.App. 3 Cir. 3/15/00), 759 So.2d 851, *writ denied,* 00-1081 (La. 6/2/00), 763 So.2d 598; *Branch v. City of Lafayette,* 95-298 (La.App. 3 Cir. 10/4/95), 663 So.2d 216; *Pelt v. City of DeRidder*, 553 So.2d 1097 (La.App. 3 Cir. 1989), and *Romero v. Town of Welsh*, 370 So.2d 1286 (La.App. 3 Cir. 1979). A plaintiff's recovery will be reduced by his own comparative fault. La.Civ.Code art. 2323; *Pelt*, 553 So.2d 1097.

The trial court found that Ball had custody or ownership of defective sewer equipment, that the defect created an unreasonable risk of harm (sewage water saturated with fecal matter and sewage gas), that actual or constructive notice of the defect was not applicable, and that Ball failed to take corrective action within a reasonable time. It further found that causation was proven by Ball's expert witness "as to the pressure problem caused by the installation of the 1987 sewage system."

Stanford testified that he moved into his home twenty-five years ago in 1977, and currently resides there with Callahan, Randy, II, and his daughter, Patience. He stated that his older daughter, Sunny, used to reside in the house but moved out in 1999, and that his other daughter, Candy, also moved out sometime in the 1990s.

Stanford testified that originally he had a septic tank, which worked well, but that Ball installed a sewerage system which he was required to hook into. Stanford stated this system had not worked well and that he had made numerous calls to the utility department, the "comm-center," the Chief of Police, and even the Mayor of Ball. He went on to state that the problems started a few months after switching

4

over to Ball's system, beginning with raw sewerage backing up into the tubs and toilets inside of his home and overflow from the manhole outside that is on the edge of his property. He further testified as to the fumes. Stanford stated that his entire house was unusable at these times; the sewage would not drain or flush and the smell was so bad he and his family had to open windows, open doors, turn on fans, and leave the house.

Stanford testified that this has happened throughout the years at varying rates; sometimes it would happen a few times a week, other times several months would go by without it happening. At the time of trial, he stated that the sewage had not backed up into his house in about a year. He further stated that Ball had done some maintenance work, including loosening the manhole cover bolts to alleviate some of the pressure so that the sewage would spew out of the manhole rather than back up into his home. Stanford further testified that he was sometimes able to rid the sewage from his tubs and toilets by removing his clean-out trap under his porch thereby allowing the sewerage to drain on the ground underneath his home.

Stanford stated that now that the sewerage drains out of the manhole he has not had any problems with it backing up into his home, but that it now runs down the rain ditch in front of his house and intersects Flagon Creek which cuts through his property.

Stanford then reviewed a diagram of his house illustrating how Flagon Creek bisects his property and discussed some video footage he and Callahan had taken in 1995, of the sewerage running out of the manhole and into the ditch and creek. He described how some of the sewerage backs up onto his yard because an

5

area underneath a bridge over the creek has not been cleaned out and it forces the sewerage up and out onto his property. The footage further showed children playing around the bridge where the sewerage water runs. Stanford testified that they try to keep the kids from playing in the area for fear they will become sick. Stanford stated that in the past the sewerage would overflow from the manhole over the course of an entire weekend. He also testified that now that someone is manually switching the pump on daily at the lift station across the street from his house, the overflow does not occur as often.

Stanford went on to state that the sewage continues to come out of the manhole, most recently within the last two-to-four months before trial. He also stated that Ball had dredged the creek, but that did not solve the problem. Rather, he claimed the dredging had caused erosion of his property. Photographic evidence of the erosion was introduced at this point in the trial. Stanford estimated that the creek bed had eroded four-to-five feet in some places and as much as twenty feet in others.

Stanford testified that he has not made any repairs on the sewerage lines underneath his house. He stated he has replaced or repaired frozen pipes, but had done nothing to any sewerage pipes. He said that he has not had any leaking sewage from any of his plumbing fixtures. Stanford further testified that two smoke tests were conducted on the plumbing fixtures in his house and that they did not show any leaks.

On cross-examination, Stanford admitted he had not photographed the sewage backing up into the tub or toilet, however, he explained that was because in the beginning he was trying to work with the town to fix the problem. He then

discussed an extensive diary he and Callahan had kept detailing the events surrounding the situation. Stanford denied having any duct tape on the plumbing underneath his home. He also admitted that he had not had his property appraised since the erosion began. He estimated that the manhole was located sixty-to-eighty feet from his house. He further testified that he recalled an incident where a squirrel got caught up in some electrical lines and killed power to the lift station.

A. David Eznack, the former sewer superintendent for Ball from January 1996 through April 2000, testified that he received complaints "a time or two" of odor at Stanford's residence. He stated that they conducted smoke testing at Stanford's residence when he was not home following a complaint when the lift station had run over and Stanford had evacuated to a motel. Eznack testified there were "quite a few leaks" in the yard and underneath the house. He further stated that following a visual inspection, he found that Stanford's pipes were reverse grade, or tilted in the wrong direction, which causes the water to become trapped. On cross-examination, Eznack did not know the date or year he conducted the smoke test.

Rodney Henry, a master plumber, testified that he sent a journeyman plumber, Patrick Burns, in July 2002, out to Stanford's residence to check and see if his plumbing fixtures were up to code. Henry stated that his journeyman said everything was fine. His journeyman further found that the fixtures and drains did not appear altered since PVC pipes had been installed and that the plumbing appeared to meet state code. Henry said that air from a sewer line is dangerous and combustible.

7

The Ball Chief of Police, Spencer Williams, testified that he has been to Stanford's home and smelled the sewer gas odors. He described the odor as strong. He stated the odors were coming from inside the home.

Bill Couvillion, an environmental scientist with the DEQ testified as to his report following an April 4, 1994 visit to Stanford's home. The report stated:

> I talked to Mayor Hebron + Mr. Karum who had been to the home earlier. They believe the home has a vent deficiency + told Randy Stanford (complainant) this is the case (to the best of their knowledge).

> I looked @ the lift station across the street + noticed no apparent problem. Mr. Karum said the station has had no recent problem.

However, Couvillion neither confirmed nor denied that a vent problem was causing the odors. A later report, dated October 7, 1994, also written by Couvillion stated:

> There is sewerage pooled in the creek that will need to be removed + disposed of legally or put back in the system. Mr. Dauzat agreed to this + had [illegible] phoned to vacuum the creek today. Will also flush w/ fresh water.

Roy Hebron, the mayor of Ball for the past fifteen years, testified that he is certified to run a sewer plant. He stated that he has received calls regarding sewer backups and smells at the Stanford residence. Mayor Hebron testified as to the April 4 incident. He said that he knew there was nothing wrong with the lift station, so it had to be a ventilation problem inside the home. Mayor Hebron stated that he gave Stanford a pop-off valve to prevent backups of the line.

Mayor Hebron went on to testify as to the "squirrel incident," which occurred in 1995. He stated that he was told that a squirrel had gotten into the line and killed power to the lift station which caused the manhole to overflow. He stated this overflow was also cleaned up. Mayor Hebron admitted to at least four

documented spills over a twenty-month period. He further testified that he ordered the lid on the manhole to be loosened so that the sewage could escape from there, rather than backup into someone's house.

Jerry Dauzat, the current sewer superintendent, testified as to the October 4, 1994 overflow incident. He stated that a float malfunctioned causing the lift station to go down, which resulted in the manhole overflowing down the ditch.

Jody Nugent, a master plumber currently incarcerated at the Lafayette Parish Correction Center, testified via deposition that he has been a plumber for twelve years. He stated that he conducted a smoke test at the request of Ball at the Stanford residence on July 13, 2000, and found no leaks under his home or in his home after inspecting under the sinks and the wax seals of the toilets and the floors. Nugent stated that if there were any leaks inside of a p-trap or pipe there would have been a cloud of smoke inside the house. Nugent further stated that he did not detect any recent repair work to the piping underneath Stanford's home and that everything looked up-to-par. Nugent also denied doing any repair work on Stanford's plumbing and further stated that he was never asked to inspect the plumbing by Stanford. Nugent stated he was totally unaware of the pending litigation.

At the hearing on the motion for new trial held on October 26, 2004, the plaintiffs requested a general damages award for their mental anguish, loss of use of their property, and the value of their property in excess of $150,000 previously rendered.

At this time, Bill Roland, an expert civil engineer and land surveyor, who is also employed by a company that works for the town of Ball, testified via

9

deposition. He conducted an inspection of the Stanford home on August 26, 2004, following the first trial. Roland reviewed photographic evidence and was also provided the town's record drawings from the original sewer installation. He stated that the Stanford home was about four feet higher than the manhole cover and that it was his opinion, based on the fact that no one had ever seen sewage running out of the top of the pump station, that raw sewerage could not have gotten as high as Stanford's floor. Roland felt that the sewerage could not have backed up into Stanford's home because there was never enough water pressure expressed as height to be high enough to enter the home. He further stated that there was no relation between the sewage overflow in the manhole and the possibility of sewage backing up into the Stanford residence. Roland testified that even though the water level and pressure would be strong enough to raise the lid on the manhole cover, this would still not be sufficient to cause sewage to back up into Stanford's home. He did state that the residence appeared properly plumbed and that he did not see any leaks or openings in the plumbing during his inspection. Roland admitted it does not meet applicable standards or codes to allow raw sewage to run into a yard or creek. He also admitted that if the bolts were tightened down and the sewage could not overflow through the manhole then the first place it would back up into is the Stanford residence.

Ball's assignments of error one through four are based on factual findings made by the trial court. We note that while we were favored with a Reasons for Judgment by the trial court, the trial court did not specify what its particular findings of fact were. Obviously, to rule as it did the trial court had to place great

10

weight on the testimony of Stanford and his witnesses. That said, we have applied the applicable standard when we reviewed the testimony and evidence. Accordingly, we find no error in the trial court's finding. Relying on Stanford's evidence, the trial court could clearly find that there was no comparative fault on the part of Stanford. Stanford had no problems with his septic tank prior to being required to join into Ball's sewer line. Numerous witnesses testified that Stanford's plumbing was up-to-par and met state standards. Additionally, the trial court had evidence to find that the "trap" Stanford created to allow the backed up sewage to run out of his home underneath his trailer does not qualify as comparative fault. His method of removing the sewage that backed up in his bathtub and toilets did not contribute to the reason it was there in there first place.

Ball's second assignment of error centers around the failure of Stanford to install the backflow valve. We find no merit in this argument. Stanford was given the backflow valve after Mayor Hebron told him he must have a ventilation problem. Stanford testified that numerous plumbers told him that sewage would not be backing up into his home because of a ventilation problem and that the backflow valve would not correct the problem.

Ball next argues that the "Act of God" defense applies. The one instance in which a squirrel cut power to the plant causing an overflow of the manhole does not eliminate the numerous other instances which Stanford and his witnesses testified that the manhole overflowed for which Ball has no "Act of God" defense. Mayor Hebron admitted that over a twenty-month period there were at least four documented overflows. The trial court heard an abundance of testimony that the manhole

11

overflowed many more times than was documented by Ball. Ball also argues here that there was no proof of sewage overrun in the Stanford home. On the contrary, the trial court apparently credited the testimony of Stanford and his entire family who testified as to how it would backup into the tubs and toilets. Thus, we are constrained to find no error in the trial court's ruling.

Ball does not address this assignment, the "physical impossibility" of sewage backing up into the home because of the four foot difference between the manhole and the height of the trailer. We assume Ball is referring to the testimony of Bill Roland. However, Roland himself admitted that if the bolts on the manhole were not loosened the sewage would backup into the Stanford home.

There was abundant evidence in the record from which the trial court could have concluded that Ball knew about the defect and did nothing to correct the problem and that the sewage backed up into the Stanford home on numerous occasions. Moreover, there was significant evidence that the manhole overflowed frequently. Further, the trial court could have relied on the fact that Ball has had to permanently loosen the manhole bolts in order to allow the sewage to overflow rather than backup into the Stanford residence. Accordingly, Ball's assignments of error one through four are without merit.

### INDEPENDENT MEDICAL EXAMINATION

Ball's fifth assignment of error was not briefed. Pursuant to La.Civ.Code art. 2133 and Uniform Rules—Courts of Appeal 2-12.4, we need not address this issue. Moreover, had it been briefed, the law of the case doctrine would apply. *See Kaleel v. Division Transp.*, 00-803 (La.App. 3 Cir. 8/23/00), 769 So.2d

12

110, *writ denied*, 00-2976 (La. 12/15/00), 777 So.2d 1232. This assignment of error is without merit.

## GENERAL DAMAGES

General damages include an award for the victim's pain and suffering, and, as such, are intrinsically speculative and not subject to mathematical certainty. *Wainwright v. Fontenot*, 00-0492 (La. 10/17/00), 774 So.2d 70. We review the trial court's general damage award using the abuse of discretion standard set forth in *Coco v. Winston Industries, Inc.*, 341So.2d 332 (La.1976). The trier of fact is afforded much discretion in independently assessing the facts and rendering an award because it is in the best position to evaluate witness credibility and see the evidence firsthand. *Anderson v. New Orleans Pub. Serv., Inc.,* 583 So.2d 829 (La.1991). The award should be based on the facts and circumstances of the particular case. *Id.* Only if we find that the jury abused its discretion, may we lower to the highest reasonable amount or raise the award the lowest reasonable amount and resort to prior awards to the extent that is reasonably within our discretion. *Youn v. Maritime Overseas Corp.,* 623 So.2d 1257 (La.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1059 (1994).

Ball strenuously argues that the trial court awarded "excessive, punitive" damages to the plaintiffs when they "did not incur one penny of special damages, seek any medical treatment, experience any diminution of property damage, or lose any use of their home due to the Town's alleged sewer backup."

The LMA also argues that in the absence of damage to the property, damages for mental anguish and inconvenience are unwarranted, or alternatively, that the amount of the award was an abuse of discretion and should be reduced.

13

The trial court must have relied on Stanford's testimony that the sewage has caused him to have headaches, nausea, and sinus infections. He stated:

> It's been embarrassing to just have to live there in that personally with your children or your fiancé that they have to, you know, smell that type of an odor in something that you're trying to make safe for them and comfortable for them, and having people visit or friends cover over or family or have outings or, you know, it's just been humiliating to have to live through it.

He went on to state that he no longer has family celebrations at his house and that he only used his yard for necessities. He stated that it is erratic and unpredictable when the fumes will be present. He further testified that he has had to leave his home and had been advised to leave the home by Chief of Police because of the fumes. He also testified that, although the sewage has not backed up into his home in several years, the fumes continued through trial.

At the hearing on the motion for new trial, Stanford introduced more photographic evidence showing the manhole extensively overflowing in January and February 2004. Stanford testified that Ball has not done anything to alleviate or correct the problems. He further testified that he tried to work with the town for seven years preceding the filing of the lawsuit. He stated that the numerous city officials who would come out would say "It's your old house."

Randy, II, testified that the sewage problems cause the residence to "stink real bad" and that it was really annoying. He stated that the fumes started in the bathrooms and spread throughout the house. Randy stated that he lives in the little house behind his Dad's house, but on the same property, and that he can smell the fumes also. Randy testified that he has had headaches and nausea and that his friends no longer come over because he does not want them to know about it.

14

Sunny testified that she moved out from her Dad's residence when she was nineteen years old in 1999. She testified that the raw sewage would back up into the tub and sinks and that when she would get up to get ready for school there would be "mucky feces" in the bathtub. She testified that there was nothing you could do to remedy the problem. She further stated that it happened too many times to count and that the odor is still present today. Sunny said she was embarrassed to have friends come over and smell "bodily fluids" in her house. She said it was humiliating. She further stated she often had to leave to go take a bath at someone else's house.

Candy testified that she lived with her Dad until sometime in 1996. She remembers the sewage backing up into the house, the smell emanating from the bathrooms, and the manhole spilling over. She testified that "liquid with feces in it" would backup into the bathtub and they were unable to shower until it drained. She testified that it happened a lot. Candy said the smell made her sick and nauseated and caused her to vomit. She further stated that she had headaches and chest pains because she would hold her breath to avoid smelling the fumes. She stated the problems were embarrassing and that her dad would want to meet the guys she was dating but that she did not want them to think she lived "in trash" or that she was "trashy or nasty" so she just did not want people to come over.

Callahan testified that the "murky water" backed up into the sink and tub. She also said there was toilet paper and feces mixed in the water. She stated that they would have to let the water drain and then scrub the facilities. Callahan stated the smell was bad and that there was nothing you could do to get rid of it. She said that water does not spew out of the manhole cover as much anymore because

15

someone goes over to the lift station and manually kicks the pump on every morning. She also stated that they have been advised to leave the property on numerous occasions by many different people due to the gases. Callahan said this situation has caused her a lot of embarrassment and they cannot have friends or family over.

Deputy Keith Baudin, formerly a patrol officer, testified that he received a call to go to the Stanford residence. He stated that when he approached the house it had a really strong sewer odor and that he advised everyone to exit the home because the smell was so strong he felt it would make them ill. He testified that they were all upset and remembered one of them saying "It's got to stop. It keeps occurring, It's got to stop."

At the conclusion of the second trial, the trial court stated:

This court finds that damages in a case of this type is difficult to assess. This case is very unique in that the absence of medical testimony and evidence does not in and of itself defeat this type of claim. Further, the lack of corrective measures and problems associated with a situation of this magnitude does not, in and of itself, mitigate the defendant's duty to do what, in fact, it should have done which is correct the sewerage problem from its inception.

If the problem had solely been the cause of plaintiff's inadequate plumbing system, that would in no way affect the Town of Ball's sewerage equipment. Plaintiff's failure to call a plumber in no way affects his ability to recover in this particular case.

We have previously noted in *Smith,* 759 So.2d at 859, that the trial court eloquently summarized a plaintiff's general damages under these circumstances:

Damages are difficult to assess in a case like this. What is worth to be driven from home? What mental anguish is occasioned by observing your home overrun by sewage? What disruption of your life would be caused by the odor of raw or partially raw sewage at your door? You cannot invite people to your home. Your children cannot invite friends to the home. What emotional toll would it take for you to

16

> clean and reclean your driveway and patio, knowing the future would bring more of the same.

Having reviewed the record, we find that the trial court had sufficient evidence to award the plaintiffs damages for the mental anguish, aggravation, and inconvenience they suffered over the years relating to this problem. However, we find that the trial court abused its discretion in awarding the plaintiffs $175,000 for mental anguish, particularly in light of the fact that no award was made for property damage.

We shall now address the issue of whether it was error for the trial court to award general damages without making an award of special damages. We do not find that it is legal error to award general damages in the absence of an award for property damage. There exists in the record evidence that Stanford suffered damage to his property as a result of the sewerage that spilled on this property as well as from the measures used to attempt to correct the problem. While this situation may not arise often, there are circumstances, as in the instant case, where a party suffers damages to his property and for unknown reasons, is not awarded money damages for that property damage by the trial court. *See Falgout v. St. Charles Sewerage Dist. #3*, 351 So.2d 206 (La. App. 4 Cir. 1977), *writ denied,* 353 So.2d 1047 (La.1978). Ball and the LMA rely on *Rizzo v. Nichols*, 03-1394 (La.App. 3 Cir. 3/3/04), 867 So.2d 73, arguing that property damages must be awarded before general damages can be awarded. We disagree. At the outset, we recall that we have affirmed the trial court's finding that Ball was strictly liable to the plaintiffs. In *Rizzo*, 867 So.2d at 78, relying on *Begnaud v. Camel Contractor, Inc.*, 98-207, (La.App. 3 Cir. 10/28/98), 721 So.2d 550, 555, *writ denied,* 98-2948 (La. 2/5/99), 738 So.2d 1, we wrote:

17

With respect to recovery for mental anguish, a panel of this court noted in *Begnaud* that such damages are appropriate:

> (1) when property has been damaged by an intentional or illegal act; (2) where property is damaged by acts for which the tortfeasor will be strictly or absolutely liable; (3) when property is damaged by acts constituting a continuous nuisance; (4) when property is damaged at a time in which the owner thereof is present or situated nearby and the owner experiences trauma as a result.

The *Rizzo/Begnaud* test requires only that property be damaged. It does not require that there be an award for that damage. Since we have found that the evidence supports a finding that Stanford suffered property damage and that Ball is strictly liable for that damage, the *Rizzo/Begnaud* requirements are met and general damages may be awarded.

In that regard, this situation has been ongoing for more than seven years. The record reflects that Stanford and his family members have undergone years of aggravation, inconvenience, embarrassment, and humiliation due to the sewage problems. After reviewing other cases involving similar injuries together with injuries sustained in this case as well the total value of the property involved, we feel the highest amount that a reasonable trier of fact could award Stanford in this case is $40,000. We further find that the highest amount a reasonable trier of fact could award to Candy and Sunny, who moved out of their father's home in the late 1990's, is $1,500, and to the remaining plaintiffs is $2,500. Accordingly, the judgment of the trial court is amended to decrease the general damage award from $175,000 to $50,500.

**CONCLUSION**

For the foregoing reasons, the judgment of trial court is amended to reduce the award to the plaintiff-appellee, Randy Stanford, from $150,000 to $40,000. Candy's and Sunny's award will also be reduced from $5,000 to $1,500 and the remaining plaintiff-appellee's awards will be reduced from $5,000 to $2,500. The judgment is affirmed in all other respects. The costs of this appeal are assessed equally between Stanford and the defendant-appellant, the Town of Ball.

**AFFIRMED AS AMENDED.**