STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-951

RANDALL VINCENT AND KAREN VINCENT

VERSUS

CITY OF IOWA

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2015-439
HONORABLE RONALD F. WARE, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Marc T. Amy, Shannon J. Gremillion, and Candyce G. Perret, Judges.

AFFIRMED.

Jerry J. Falgoust
Falgoust and Caviness, L.L.P.
505 S. Court Street
Opelousas, LA 70571-1450
(337) 942-5812
COUNSEL FOR DEFENDANT/APPELLANT:
    City of Iowa

Gregory P. Marceaux
Marceaux Law Firm, LLC
2901 Hodges Street
Lake Charles, LA 70601
(337) 310-2233
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Randall Vincent
    Karen Vincent

**AMY, Judge.**

The plaintiffs filed suit after a City sewerage line discharged into their home in 2014, causing damage to their home as well as their personal property. Although the City provided for certain repairs to the home, as well as relocation expenses while their home was being repaired, the City denied their remaining claim. It instead challenged the extent of the plaintiffs' loss and asserted that the plaintiffs failed to properly mitigate their damages. The trial court found in the plaintiffs' favor as to a first incidence of sewage discharge, awarding damages for certain contents of the home, mental anguish, and loss of use. The trial court denied damages associated with a second sewage discharge event. The City appeals. The plaintiffs answer the appeal, seeking additional damages. For the following reasons, we affirm.

### Factual and Procedural Background

The plaintiffs, Karen and Randall Vincent, allege that on February 2, 2014, they discovered sewage overflowing from a toilet into their Iowa home while preparing for a Super Bowl Sunday gathering. The discharge was subsequently found attributable to blockage in the City of Iowa's sewerage line.

Mrs. Vincent explained that, while preparing for her party, she noticed that her feet had become wet and that she subsequently discovered the sewage waste coming from a toilet in what appeared to her to be a "volcano[.]" The record indicates that the sewage flowed into multiple rooms of the home and reached accumulations of up to two inches. Mr. Vincent was able to stop the overflow by releasing a "washout cap" outside of the home. He explained, however, that once the cap was opened, "[e]verything started gushing out there on the ground. The toilet paper, fecal matter … you can just about imagine."

With the overflow stopped, the plaintiffs, along with family members, immediately began to remove the accumulation of what was identified as raw sewage from the interior of the home that evening, doing so until approximately midnight. The City was contacted the following day, with its Public Works Director visiting the home. Although testimony indicated that an obstruction in the line was identified and remedied, the plaintiffs alleged that a second overflow occurred on February 5, 2014. Mrs. Vincent explained that she discovered the second overflow, which purportedly occurred in the master bathroom.

A few nights later, the plaintiffs, along with their daughter and three grandchildren, [1] relocated to two adjoining rooms at a nearby hotel due to conditions in the home and so that repairs could be made. With regard to the latter, a contractor began working in the home, replacing flooring, replacing sheetrock, and painting the interior. During that period of construction, the plaintiffs stored much of the home's contents in a storage "pod" placed on their driveway for that purpose.

The plaintiffs and their family returned to their home from the hotel after approximately two months. By that time, the City had compensated the plaintiffs for their hotel stay and for related living expenses. Additionally, the City approved the payment of approximately $29,000.00 in repairs to the home. However, the City rejected the plaintiffs' claim for damages associated with the second discharge, that allegedly occurring in the master bathroom on February 5, 2014.

Mr. and Mrs. Vincent filed this matter in January 2015, alleging that the City's negligence in the maintenance and inspection of the sewerage system was

---

[1] The record indicates that the plaintiffs' daughter and her three children also lived in the home.

2

the sole cause of the occurrence. The plaintiffs sought an award for property damage, depreciation of property, mental anguish and emotional distress, loss of earnings, rental expenses, and other unnamed damages. Following a two-day bench trial, the trial court found in favor of the plaintiffs, concluding that "there's no doubt that the City of Iowa is responsible for the February 2nd, '14 overflow and the ... backflow into [the] house." However, the trial court denied certain claimed damages, but awarded damages as follows: $45,699.00 for contents damages; $75,000.00 for mental anguish damages ($35,000.00 to Mr. Vincent and $40,000.00 to Mrs. Vincent); and $60,000.00 for loss of use. The trial court imposed the latter loss of use award with a $15,061.00 credit in favor of the City for "loss of use damages previously paid[.]" The trial court denied an award associated with the alleged February 5, 2014 overflow.

The City appeals, asserting that the trial court: 1) abused its discretion in awarding a total of $75,000.00 for mental anguish; 2) abused its discretion in awarding $60,000.00 for loss of use of the residence (with a $15,061.00 credit for hotel expenses previously paid); and that it 3) was manifestly erroneous in its award of $45,699.00 for household property based upon what it considers were unreliable value estimates. The plaintiffs answer the appeal, seeking an additional $8,411.51 for replacement items purchased and $31,256.00 for further damages associated with the repair of the home.

**Discussion**

*Mental Anguish Damages*

In its first assignment of error, the City questions whether the plaintiffs "experienced trauma as a result of the property damage and, if so, did the Trial Court's finding that Randall and Karen Vincent were entitled to awards for mental

anguish of $35,000[.00] and $40,000[.00] respectively, represent an abuse of discretion[.]"

As a starting point, we note that an award of damages for mental anguish arising from property damage is limited to situations in which property is damaged: 1) by a tortfeasor's "intentional or illegal act"; 2) by an act "for which the tortfeasor will be strictly or absolutely liable"; 3) by an act "constituting a continuing nuisance"; or 4) "when the owner is either present or nearby and suffered a psychic trauma as a direct result." *Zaveri v. Husers*, 16-866, 16-867, p. 21 (La.App. 3 Cir. 6/21/17), 224 So.3d 389, 404-05 (quoting *Holzenthal v. Sewerage & Water Bd. of New Orleans*, 06-0796, p. 39 (La.App. 4 Cir. 1/10/07), 950 So.2d 55, 79, *writ denied*, 07-0294 (La. 3/30/07), 953 So.2d 71), *writ denied*, 17-1286 (La. 11/6/17), 229 So.3d 475. As related above, it is uncontested that the plaintiffs in this case were in their home, witnessing and personally addressing the offending overflow of sewage into the home.[2]

In *Zaveri*, 224 So.3d 389, a panel of this court explained that, although mental anguish damages may be appropriate in cases involving property damage, the complained-of anguish must constitute an actual mental injury. Mere worry associated with consequences of property damage is insufficient. *Id.* However, there is no requirement that associated medical treatment be pursued by the plaintiff. *Id.* Turning to review of the award in this case, we are mindful that "the

---

[2] For completeness, we further note that jurisprudence has previously indicated "that a municipality is strictly liable to a plaintiff property owner under [La.Civ.Code art.] 667 when damages are suffered due to sewage overflows into a home from a municipally owned and operated sewer system." *Stanford v. Town of Ball*, 05-38, p. 4 (La.App. 3 Cir. 6/1/05), 903 So.2d 1235, 1239, *writs denied*, 05-1684, 05-1709 (La. 1/9/06), 918 So.2d 1053, 1057. In this regard, La.Civ.Code art. 667 provides that: "Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."

assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." La.Civ.Code art. 2324.1.

The City argues the circumstances of Mr. and Mrs. Vincent collectively in its unified assignment regarding the mental anguish awards. The City acknowledges in its brief that "[e]xperiencing sewage backing up into one's residence is undoubtedly a traumatizing experience." However, in arguing that the quantum awarded is excessive, the City suggests, in part, that Mr. and Mrs. Vincent experienced the difficulties in their home for a finite period, returning to the home after two months of renovation. Thus, the City contends, if any such award is appropriate in this case, this court should fashion an award in keeping with the $2,500.00 award for mental anguish found appropriate in *Thibodaux v. St. Mary Parish Sewer District 07*, 09-1466 (La.App. 1 Cir. 2/12/10) (unpublished opinion).

On review, however, we find that the trial court's awards to both Mrs. and Mr. Vincent are supported by the record. We first address the $40,000.00 award to Mrs. Vincent. In fashioning that award, the trial court referenced Mrs. Vincent's detailed testimony at trial in which she related her experiences as follows:

> There is mental anguish in this case. I kind of let Ms. Vincent go because she was suffering up here on the stand. And she probably needed to vent some. Let her go. Get it off her chest. I'm not going to say that that is what controls or I'm grounding this decision on, but I could see her pain and - - still today. S[h]e did mention it to her doctors during her visits and the doctors, I think Ms. Vincent said, may have even increased certain medications because of what happened.

In her testimony, Mrs. Vincent explained that she previously had great pride in the presentation and cleanliness of her home, which was constructed following the destruction of the family's prior home in the same location by Hurricane Rita.

5

She described her discovery of the sewage overflow with detail, reporting that "it was just going everywhere[]" and that she "couldn't get it to stop." She explained that the family set about cleaning the overflow, which she stated "reeked" and which, in some areas, "was going over [her] foot[.]" In addition to the hours that the family spent cleaning the home that evening, both she and her husband continued to attend to matters at the home[3] during the two months that repairs were made to the affected areas of the home. As to the scope of the problem, testimony and documentary evidence indicate that the sewage spread from the originating bathroom into two bedrooms, the great room, the foyer, the sunroom, the breakfast area, the kitchen, and the dining room. Given the ongoing repairs, the six-member family was relocated from their 3,000 square foot home to two-adjoining hotel rooms for two months.

When asked how the occurrence had affected her, Mrs. Vincent testified that:

> When it was all first going on it was a disbelief. It was like it wasn't going on. It was like an awful dream. Then when we w[ere] packing up stuff everybody was trying to help and everybody was making fun, you better be careful … because it was, it was my pieces, my antique pieces. A lot of glass. Pieces did get broke and I'd cringe. Everything - - all I could see, I guess because it hadn't - - I'm still not … I'm still not over [Hurricane] Rita … So going through this, it was like we w[ere] going all back through it because it was hell … I just

_____

[3] Mrs. Vincent explained that, each evening after Mr. Vincent finished work:

> He'd go straight to the house every day. Don't matter how bad the day was or whatever, he'd go straight to the house. And I'd be there already … [a]nd I'd stay there and we'd stay until suppertime or even sometimes after that and we'd clean, we'd try to mop, we'd try to wipe the kitchen cabinets. We didn't want anything to grow up on them because the mold[] was coming up on the baseboards and stuff and we was afraid the kitchen counter - - the kitchen cabinets were going to do the same, so we kept those wiped down every evening. Because we didn't know what was behind them because they didn't deem [sic] the money to take out the kitchen. So, I mean, we just cleaned until we couldn't clean no more, until we got too tired … and we'd go to the motel and crash - - take baths and crash.

could not deal with it. And when I started losing the fish, the aquariums[4] and the pieces were just - - you know, you'd think, look how old they are and once they hit my hands they're gone. You know, all th[ose] years just down the tubes.

As addressed below, Mrs. Vincent further testified that she felt that the home continued to have an odor, one which she identified as a "musk" and explained that she now apologizes to guests to the home. Mrs. Vincent explained that, although her home had previously been "pristine," she now felt that there was "filth" everywhere, and that she lost interest in maintaining the home as she once did. When asked whether she was "suffering from depression[,]" Mrs. Vincent responded: "Oh, yeah." On this point, Mrs. Vincent denied having sought medical attention strictly related to this incident, but that "it [was] rolled over inside" appointments for her pre-existing medical conditions. As identified by the trial court, Mrs. Vincent explained that her physician "went up on some of [her] medicine, things like that[.]"

Other witness accounts supported Mrs. Vincent's testimony. Mr. and Mrs. Vincent's son, Randall Vincent, Jr., responded "Oh, yes[]" when asked whether the incident affected his mother "emotionally[.]" In particular, he explained that Mrs. Vincent would "just start crying" upon the removal of antique furniture from the home and into the storage pod. He stated that: "Oh, man, carrying stuff out, seeing where the old finishes of the wood was just warping and wrinkling, coming off. She'd just start crying. You know … it's a collection, her hobby. That's what she loved to do." Mr. Vincent explained that his wife was "very depressed at times" and that "[s]he'd brush her hair and, you know, large amounts of hair would come

---

[4] Mrs. Vincent testified that her fish in the aquariums did not survive their relocation.

7

out from the stress." Also, when asked to describe how Mrs. Vincent was affected, her daughter-in-law, Ashley Nicole Cormier, explained that:

> Her - - everything was flipped upside down. They didn't know when they were going to be able to get back into their home. She lost a lot of things. She knew that she - - she knew she was going to lose them. It was upsetting. She was depressed. She cried a lot. I know it fluctuate [sic] her blood pressure. She stayed with headaches. She kind of got quiet and shut down. She didn't want to talk about anything.

Mrs. Cormier further explained that Mrs. Vincent "would get headaches and get so stressed out that she would vomit."

Turning to the award of $35,000.00 to Mr. Vincent, the transcript indicates that he too testified regarding his and the family's initial efforts in cleaning the sewage as well as his after-hours work to address the ongoing problems at the home. Mr. Vincent explained that, in the days following the occurrence, he "[c]ontinued with cleaning trying to get as much of this liquid up … once you walk across this wood floor it would seep up between the cracks and … create little puddles and you'd have to mop that up or suck it up with … the shop-vac I had." Mr. Vincent noted that the liquid worked its way underneath the walls and, in the kitchen, underneath the cabinets. He explained that the family initially stayed in the home at night, but that it "reeked" or had a "raw sewage smell[.]" He stated that they "opened up the windows in the house to try to relieve as much of the smell as we could." As explained above, the six-member family thereafter moved into two adjoining rooms at an area hotel. Describing himself as a "creature of habit[,]" Mr. Vincent explained that:

> Well, without saying anything bad about the hotel, the hotel is a great hotel, but it's not like living at home. It was terrible. You couldn't sleep, there was a lot of noise up and down the hallways at night, you know, contractors in there, you didn't sleep as well, it's

uncomfortable,[5] it's not like being in your own bed. You think of staying in a hotel, you're going on a vacation somewhere and you're enjoying yourself, but this was not very enjoyable at all.

He further noted that the hotel stay disrupted the family's eating habits and that they "ate a lot of fast food." When asked whether the period was stressful, Mr. Vincent responded that:

> Oh, it was very stressful. You know, trying to deal with staying in a hotel, getting foods every night, you know, feeding every one at night, not sleeping very well, dealing with the rigors of having to go to work every day and then come home and work in the house, clean, and clean up behind the construction workers, and doing my best to disinfect it and try and help kill the smell in the house.[6]

As she did with Mrs. Vincent, Mrs. Cormier testified as to the effects of the occurrence on Mr. Vincent. She explained that:

> For a man that has a routine every day, he gets up, he goes into work an hour and a half early, stops by McDonald's every day and gets a [C]oke, and if he does not show up they call. He was put in a hotel for three months. He didn't sleep, not good anyway. He got ulcers in his mouth. He can hardly talk whenever that happens, stayed like that for several months. It's hard - - it was hard for him to eat.

Mr. Vincent also addressed his condition, explaining to the trial court that:

> When I get under stress I develop mouth ulcers and I can tell you it's very miserable, because you can't eat anything with - - with gravy or a lot of salt because of burns - - burns it like dickens. And when you get them on the inside of your cheek or on your tongue it makes it difficult to talk. You know, you're constantly having to hold your - -

---

[5] Mrs. Cormier described the living condition at the hotel as follows:

> They were very cluttered. Everywhere you turned you were bumping into somebody. It was very chaotic. I mean, there was three small kids and then mine was [sic] in there, so that's four. So she was just - - it was very noisy, very chaotic.

[6] Mr. Vincent explained that:

> In the evenings when I got home from work I cleaned the floors in the house trying to disinfect as much as I could and eliminate some of the odor in the house. I used Pine-Sol … to mop the floors with, as well as bleach and water, and then afterwards, after that dried, I walked around and I sprayed the floor with OdoBan, which pretty much acts like bleach and water. It kills 99.9 percent of germs and stuff, and plus it gives off a little better fragrance.

hold your hand over your mouth and stuff like this and try and talk out of one side of your mouth because it hurts.

When asked if he visited a physician due to the ulcers, Mr. Vincent explained that: "I had medication from previous encounters with [the ulcers], but also I had to talk to him about maybe increasing or giving me something a little bit stronger because they flare up and they don't go away for an extended period of time."

Also, upon being questioned whether the events had been "difficult" on her husband, Mrs. Vincent replied:

It was … Randy's a quiet type person.  It's really hard to read him, but you knew he was messed - - all he kept saying, I just want to sleep.  I'm tired.  I want to go to bed.  I'd try to get whatever to cover it, you know, and he tried to just, you know, go with the flow of things and he wasn't … he's funny about his food.  I mean, even his dinner, because he eats food food at night.  We don't eat fast food.  I mean, he eats his real food and then he always makes his dinner out of that and brings it the next day to work.  And he doesn't do - - we just don't eat fast food.  Well, we can't.  With our health, we just can't.  But Randy has to eat food food.  And it was hard on him.

In awarding damages, the trial court pointed to Mr. Vincent's physical condition and Mr. Vincent's concern regarding the disruption to his routine diet, and explained:

Mr. Vincent may have had a … pre-existing condition of having ulcers as a result of stress.  And the lawyers know, we hate to call somebody a victim, but we take our victims as we find them and he was - - he suffered these ulcers.  Difficulty, I can imagine that, difficulty eating and talking.  Forced to eat a diet they weren't accustomed to that was unhealthy for them.

Following review, we find that the trial court's ruling is supported by the record as to both plaintiffs.  Each offered testimony regarding their respective difficulties following both the occurrence in their home and the subsequent disruption in their life associated both in addressing the situation in the home as well as in their relocation.  Additionally, and as demonstrated by the testimony

above, the record supports a finding that each suffered physical consequences following the sewage overflow.

While the City contends that reference should be made to the $2,500.00 award made in *Thibodaux*, 09-1466, we find no merit in its assertion. Significantly, *Thibodaux* represents a case in which an appellate court rendered an award for mental anguish. The present case instead requires a deferential review by this appellate court of a trial court's award for mental anguish. Recall that this court reviews such an award for an abuse of discretion rather than *de novo*.

Also, this matter is factually distinguishable from *Thibodaux*, 09-1466. While the plaintiff in *Thibodaux* also found sewage spewing in her bathroom and became covered across her lower body with the substance, the resulting situation, as reported in that case, was not as comprehensive as the situation in the Vincent home. Importantly, there is no indication that the plaintiff in *Thibodaux* was required to relocate from her home for an extended period, that her home experienced the type of extensive property damage as seen in this case, or that the plaintiff experienced physical complaints as did Mr. and Mrs. Vincent. Rather, *Thibodaux* indicates that the home in that case was cleaned the following day by a professional cleaning agency.

Here, Mr. and Mrs. Vincent witnessed the overflow of raw sewage, including what was described as fecal matter, into their home. They personally removed the initial accumulation of up to two inches of the liquid, which spread through numerous rooms and moved underneath walls, baseboards, and cabinetry. After a contractor was engaged, they continued to personally attend to the cleaning and sanitizing of the home. In addition to the associated property damage, and related stressors such as the two-month relocation, both Mr. and Mrs. Vincent

11

suffered physically, including the manifestations addressed above. For these reasons, and although toward the higher end of the permissible range for such an award under these circumstances, we find no abuse of discretion in the trial court's award of $40,000.00 in damages for mental anguish to Mrs. Vincent and $35,000.00 to Mr. Vincent.

This assignment of error lacks merit.

*Loss of Use*

The City next questions the trial court's $60,000.00 award for loss of use of the home. Noting that it was credited for the $15,061.00 provided to the plaintiffs for their two-month stay in the hotel as well as associated incidentals, the City suggests that the remaining figure was disproportionate to the costs of a rental home during that period.

Like the mental anguish damages discussed above, this court reviews a trial court's award for loss of use under an abuse of discretion standard pursuant to La.Civ.Code art. 2324.1. We note here that the City argues that jurisprudence indicates that loss of use and enjoyment damages are limited to the rental value of replacement property. In support of that proposition, the City references *Reisz v. Kan. City S. R. Co.*, 148 La. 929, 88 So. 120 (1921) and *Nolan v. Liuzza*, 301 So.2d 892 (La.App. 4 Cir. 1974). However, a reading of those cases does not indicate that a trial court's award for loss of use and enjoyment of property is limited as suggested by the City.

In *Reisz*, 88 So. at 121, the supreme court considered a case in which the plaintiff sought recovery of the rental value of property "during the period of repair[.]" The trial court did, in fact, find such an award permissible, but only up until the time the property was sold, ten days later. *Id.* In this case, however, loss

of use was not awardable solely as special damages, but at least in part as a type of general damage.

The fourth circuit's opinion in *Nolan*, 301 So.2d at 893 is similarly distinguishable as that panel framed the question before it as "whether or not the owner of an automobile, temporarily deprived of its use while tort-caused damages are being repaired, may recover for that loss of use from the tortfeasor." In resolving that question in favor of the plaintiff, the fourth circuit did so in terms of economic recovery associated with costs incurred in securing a rental car during the repair period. *Id.* That court evaluated the award upon consideration of whether the plaintiff had demonstrated reasonable diligence in securing repair of the car. *Id.* Such an economically-driven special damage is not the type of damages supported by the present record.

Rather, further reference to *Nolan*, 301 So.2d at 894 (citations omitted) reveals the central difference between that case and this one, as the fourth circuit explained that: "The period of compensable loss of use is only 'the time required by the exercise of proper diligence to secure its repair,' and, when damage is very extensive, the time needed to determine whether the car is economically repairable or should be replaced[.]" By contrast, the plaintiffs in this case do not only claim recovery for the two months they were not able to enjoy their home during the period of repair. They further contend that the City did not adequately repair their home and, accordingly, their ability to use and enjoy the home was diminished and, in fact, is a continuing diminution. This concept is in keeping with the loss of use award found appropriate in *Smith v. Cutts*, 99-253 (La.App. 3 Cir. 3/15/00), 759 So.2d 851, *writ denied*, 00-1081 (La. 6/2/00), 763 So.2d 598. In that case, a panel of this court affirmed a trial court's distinct awards for loss of use of property

and mental anguish in a case involving a sewage overrun onto the plaintiffs' property. *Id.* In doing so, and citing La.Civ.Code art. 1999,[7] the panel noted that the "trial judge faced a situation where damages are insusceptible of precise measurement" and that, "[l]acking an exact estimate of damages, he was free to base his conclusions on the facts and circumstances particular to the case." *Id.* at 859.

Of course, the City was credited with the plaintiffs' expenses associated with the relocation in this case. Also, the trial court awarded expenses associated with the plaintiffs' mental anguish, addressed above. However, the record further supports an award of damages associated with the inability to use the home during the period of repair, as well as for diminished enjoyment of the home *after* the renovation. For example, in its ruling, the trial court addressed Mrs. Vincent's complaint regarding the remaining smell in the home and explained:

> As far as the smell in the house, and actually I don't think that the Vincents were saying that they became accustomed or immune to it. I think some of the other witnesses said that maybe the reason they didn't smell it is because they had become accustom[ed] or immune to it. The SERVPRO guy said that. I know that Mr. Vincent said that he didn't smell it necessarily that much or at all, but Ms. Vincent said that she smelled it and Ms. Cormier said that she smelled it for a long time afterwards. And you have to consider that this stuff went under the cabinets. That was never decontaminated or sanitized or deodorized. I can't say that they're making it up. Each person is different and it could be a mental component to a false smell or thinking you smell it because of all of the trauma.

With regard to what she perceived as a lingering odor, Mrs. Vincent testified that she continues to detect a musk odor in her home and that, although she "had a

---

[7] Louisiana Civil Code Article 1999 provides that: "When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."

brand new house[,]" she does not "event want to be in [it] anymore[.]" She further explained that:

> We don't even bring people over to the house because I told [Mr. Vincent] … you might not be able to smell as much I - - I said, it's a musk. It's not sewage like it used to be, but it's a musk - - like wet dog, dirty smell in the house and I can't get rid of it. I light candles, every new flavor that comes out, I got it. All them plug-ins are all over the house. Potpourri is in almost everything with oil in it. I just can't get that smell out of the house … I used to open my door and you'd have that new smell still in the house … because we don't smoke or anything, and so you'd always have that when you open the door. You don't have that no more.
>
> . . . .
>
> [W]hen people come over I apologize. I said, I'm so sorry, because I feel like they can smell it just like I do. And I don't want them to think I'm a dirty housekeeper.

Mrs. Cormier, who also addressed the alleged smell in the home, stated that: "You can still smell it." She identified the smell as "[r]otten eggs." When counsel questioned whether the smell had improved, she explained that: "Some days are better … than others, but some days you can walk in there and it's like walking in there and it's overflowing again."

As identified by the trial court, Mr. Vincent admitted that in his pre-trial deposition he stated that he had last smelled an odor in the home several weeks to a month after the overflow. However, the record supports the view that his use of the home changed as well, with Mrs. Vincent explaining that: "He doesn't go in the house a lot. He stays outdoors a lot now, except when football's on." She further explained that he would previously "come around when there was, you know, when we'd have parties or something" and that he took pride in showing their antiques collection to visitors, but that "[h]e doesn't do that no more."

In sum, and again while perhaps reaching the upper boundaries of the trial court's discretion in this case, we find that the record supports the award of $60,000.00 for the plaintiff's loss of use of their property. In particular, we note that the plaintiffs supplied distinct evidence sufficient to prove the separate awards for loss of mental anguish and that associated with the loss of use of their home, both during and after the repair efforts in the home.

This assignment lacks merit.

*Contents Damages*

In its final assignment of error, the City suggests that the trial court's award of $45,699.00 in damages for the plaintiffs' household contents was in error as, it contends, the award was based solely on value estimates placed upon the items by Mrs. Vincent that were not otherwise corroborated. The City contends that the trial court was instead required to award damages based on the cost of restoration of the items or the difference between the value of the property before and after the incident. It further contends that the plaintiff was required to prove that valuation by competent evidence.

Like general damages, an appellate court reviews a trial court's award of special damages, such as the award for contents damages, for abuse of discretion. *See Guillory v. Lee*, 09-0075 (La. 6/26/09), 16 So.3d 1104 (citing La.Civ.Code art. 2324.1). The appellate court considers whether there is a reasonable factual basis in the record for the trial court's findings and whether those findings are clearly wrong. *Id.*

We take these arguments in turn, first addressing the City's contention that the trial court's award of replacement costs was contrary to the supreme court's explanation that:

16

> [A]s a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm. Consequently, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building.

*Roman Catholic Church of the Archdiocese of New Orleans v. La. Gas Serv. Co.*, 618 So.2d 874, 879-80 (La.1993). Thus, the City argues in its brief that "where, as here, *the damage caused by the tortfeasor is capable of being restored*, the person whose property was damaged is entitled to receive either the cost of restoration or, at his election, the difference between the value of the property before and after the harm." (Emphasis added.)

However, that argument ignores the trial court's rejection of the City's position that the items claimed could be "restored." *See Roman Catholic Church*, 618 So.2d 874 (a case involving a claim for restoration of immoveable property). In support of its position, the City presented the testimony of Bob Weldon, accepted by the trial court "in the field of water-related contents in valuation/appraisal." Mr. Weldon estimated the plaintiffs' contents loss to be approximately $10,000.00. However, Mr. Weldon's testimony indicates that his valuation included a view that the legs to the furniture could be "sanitized" after contact with the sewage and that the damages otherwise sustained were not subject to repair. He explained that he did not know of anyone in the area that performed antique furniture repair. He further denied that some items needed replacement,

17

suggesting that items such as toys and bedding that came in contact with the sewage could be simply cleaned and returned to use.

In addressing this disparity between the plaintiffs' position of replacement and the City's view of "restoration," the trial court explained:

> [L]et me just say this, as far as picking up and laundering some stuff that you put down in that kind of stuff, I wouldn't want it within the city limits of where I lived. It's hazardous material. It's stinky and it's garbage. And I wouldn't wash a bedspread and put it back on. I wouldn't wash socks and T-shirts and put it back on. It was damaged goods. That stuff needed to be replaced. As far as the contents about the drum,[8] it makes all the sense in the world to me that it's time to get a new set of drums. Those drums … I think you said wash - - just wash the legs of the - - the stands, nobody wants that anymore. I don't think that's an unreasonable reaction.

On this point, we leave the trial court's ruling undisturbed. Notwithstanding the parties' candid description of the discharge, the fact that it was sufficiently damaging as to require the removal of flooring, carpeting, and sheetrock indicates that the trial court permissively determined that certain property was not restorable. Additionally, and as seen in the discussion of the City's claim that the plaintiffs failed to mitigate their damages, the City takes the position that it is not responsible for damage sustained by the relocation of the furniture during the repair period. However, the trial court discounted that position too, concluding that the family did so in an attempt to prevent further damage.

As explained above, the City also contends that the plaintiffs failed to adequately document and corroborate Mrs. Vincent's estimate of replacement damages. The City cites *Keaty v. Moss Motors, Inc.*, 93-1452, 93-1453 (La.App. 3 Cir. 6/1/94), 638 So.2d 684, 686 (citations omitted), *writ denied*, 94-2211 (La. 11/11/94), 644 So.2d 399, for the proposition that: "[I]t is the plaintiff's burden to

---

[8] A portion of the plaintiffs' claim involved their grandson's drum kit.

prove with legal certainty every item of damage claimed. This burden must be borne by competent evidence showing the extent of damages and plaintiff's own uncorroborated personal estimate of loss is insufficient."

However, the plaintiffs did not present merely an uncorroborated personal estimate of loss as suggested by the City. Rather, reference to the transcript indicates that Mrs. Vincent testified that she provided an itemized list of property claimed, many with corresponding photos of the items, and for which she either recalled how much she had paid for the item originally or which she estimated based on internet research. Regarding her lack of receipts for her collection of antique furniture for which she sought damages, she noted that she generally did not retain receipts and that she and her husband purchased such items in cash. She was able to produce receipts for certain items she had replaced after the overflow.

In assessing the damages, and although the trial court credited the plaintiffs' valuations to an extent given her history of collecting antiques, the trial court did not fully accept the plaintiffs' claim. The trial court evaluated the various spreadsheets and itemizations presented, explaining:

> [A]s far as "P-6" goes, there are quite a bit of items still in use. There are 56 items included in that exhibit. Mr. Weldon said those were nice pieces and he didn't say that they weren't antiques. He said he couldn't say. But Ms. Vincent said they were and I take her word for that. This lady knows more about antiques than everybody else in this room combine[d], I'm sure. And that's worth something in my mind[.]

The trial court thereafter turned to consideration of the plaintiffs' itemizations, rejecting certain items claimed upon a finding that some items were still in use and a determination that other items, such as a fish tank, were not compensable.

Following review, we leave the trial court's determination undisturbed. In short, and given the trial court's consideration of Mrs. Vincent's knowledge

regarding her collections, we find no merit in the City's contention that the plaintiffs' personal estimate was uncorroborated. Rather, and in addition to Mrs. Vincent's testimony regarding her recollection, the trial court was able to review the itemized spreadsheet, valuations, and photographic documentation that corresponded with one of the spreadsheets. And, as mentioned above, receipts were produced for many of the items purchased after the overflow. Given these circumstances, we find no abuse of discretion in the trial court's award of damages for the plaintiffs' household items. *See, e.g., Blake v. City of Port Allen*, 14-0528 (La.App. 1 Cir. 11/20/14), 167 So.3d 781.

We next turn to consideration of the City's final contention that the trial court erred in failing to reduce the award of contents damages due to a failure to mitigate on the part of the plaintiffs. However, the trial court's ruling reveals a finding that the plaintiffs did, in fact, mitigate their damages. Regarding the family's initial response to the flooding event, the trial court observed that:

> I was impressed by the testimony of the Vincents and the other plaintiff witnesses about the extent of the discharge or the overflow. They immediately went into mitigation mode by opening the release valves or the clean-out plugs and stopped it themselves. They didn't wait for an hour to call somebody. They immediately got things, coverings, rugs, other absorbent materials to sop up the mess. I can only imagine it was quite a mess. They - - I have to applaud them, actually, for getting on it right away. I mean, they didn't sit around with the hand-wringing going on. They got on it. I don't fault them for not calling the city on a Sunday, Super Bowl Sunday. That - - they were dealing with, I don't know, what could easily be called a catastrophic event and they - - that didn't cross their mind. They got on it the next morning. It had stopped. I don't know what happened or the benefit of what - - what could the city have done on that Sunday that they couldn't [have] do[ne] that Monday. The flow had stopped.

Further, in specific response to the City's contention regarding the plaintiffs' placement of their furnishing in a storage pod rather than a climate-controlled environment, the trial court stated:

You going to get professional movers to put the contents in the pod? They didn't wait on anybody to get a pod. They had help from the contractor and got the pod right away and they did the best they could. They didn't wait for an extended period of time before they tried to store - - before they did in fact store the contents. That was an act of mitigation also.

Upon review, we find that the record supports the trial court's determination. In fact, many of the damages associated with this element of the plaintiffs' claim were sustained due to the plaintiffs' attempt to respond to the situation. Much of the claim for personal items, bedding, and rugs related to their efforts to stop and clean the sewage incursion. While the City's adjuster suggested that these items could simply be washed and reused rather than being replaced, we find no error in the trial court's conclusion that such a position is untenable, given the property's contact with sewage. Similarly, and while it is undisputed that much of the furniture damage was caused due to its placement in a storage pod, the trial court deemed this action demonstrative of the plaintiffs' attempted mitigation of their damages. In fact, the City offered evidence that it provided reimbursement for the storage pod for which it now contends was the source of much of the damage and of which it now complains.

Finding that this assignment lacks merit, we turn to consideration of the plaintiffs' answer to the appeal.

*Answer*

The plaintiffs answer the appeal and first note that the repairs to their home cost in excess of $31,000.00, but that the City paid only $28,736.61 toward that cost. By their answer, the plaintiffs seek an additional $2,519.39, which represents the parties' dispute as to replacement costs associated with the home's wood flooring. Testimony at trial indicated that the original wood flooring was no longer

available, but that Mrs. Vincent selected another type of wood flooring, accounting for the increased costs. On this point, we maintain the trial court's ruling, noting lack of clarity as to the replacement floors so as to support the trial court's silence on this element of recovery. We similarly reject the plaintiffs' claim that they are owed an additional sum for replacement household items. While the plaintiffs did, in fact, produce receipts for many of those items, reference to the plaintiffs' indexes as to damaged items and the trial court's fashioning of the contents damage along those lines undermines the plaintiffs' contention that the trial court did not compensate them for those items.

Accordingly, we maintain the trial court's assessment of damages.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this proceeding are assessed to the appellant, the City of Iowa, in the amount of $8,995.64.

**AFFIRMED.**